We have four cases for argument this morning, and we'll take a recess between the third and fourth cases. But before we hear the first case, we have a motion from Judge Clevenger. Thank you, Judge Dyke. It's my pleasure to move the admission to the Bar of this Court of a highly qualified young woman who happens to be one of my law clerks. I move the admission of Michelle Ann Ankenbrand, who is a member of the Bar in good standing of the highest court in the state of New York. I have knowledge of her credentials, and I'm satisfied that she possesses the necessary qualifications. Should we grant the motion, Judge Ranham? Yes. The motion is granted. We welcome you to the Bar of the Court, and we hope to have you appear before us someday. It would be excellent. Thank you. Judge Ranham, you swear or affirm that you will comport yourself in the purview and custody of this court? I do. All right, and according to the law, you support the Constitution of the United States. I do. Congratulations. You're welcome to the Bar. Okay, we'll hear our first case, number 2011-1080, Cheng Tzu, Wujin v. United States. Mr. Craven. May it please the Court, good morning. My name is David Craven. I am with the law firm of Riggle & Craven in Chicago, Illinois. I am appearing today on behalf of Jiangsu Jianghai Chemical Group Company, Ltd. Appellant submits that the matter before this court is— Are you familiar with the recent decision of the Court of International Trade in the Yang Tzu Best Pack case? Your Honor, I'm afraid I do not specifically recall that decision. Well, it's a decision by the Court of International Trade where they ruled—and distinguished this case— ruled that it was not permissible in coming up with a specific rate to use adverse facts available with respect to that calculation. And I guess I'm wondering, is your argument here that because your client, the appellant, was a cooperative respondent, that it wasn't appropriate to calculate the rate for your client using the adverse facts available, that it was necessary to use actual data? No, Your Honor. I don't believe that, in fact, would have been our—we might have made that argument had the issues been—had that decision come out before we argued this. But we did not object to, and we never raised before the Court of International Trade the issue as to whether using an average of a surrogate AFA and a zero, we did not challenge whether or not that was an appropriate manner for calculating the separate rate issue. And since we didn't raise it, Your Honor, we don't believe that it would be something we would raise here. Well, but if you're not raising it, then what is the tenor of your argument that Commerce was compelled to use data for cooperating respondents? I mean, that sounds as though you're suggesting that they should not have used adverse facts available. No, Your Honor. I think our position—our primary position is that the U.S. price was agreed upon by all parties during the review itself. It was not raised in the Court of International Trade. I understand, but putting— This is not the actual AFA rate in that there is an AFA rate that applies, which is not the rate they're using as the average. This AFA rate that's involved here is not being used for any other party. It's not being used for any party at all. The parties that received an AFA rate received the AFA rate and did not challenge it, and so it remained at the rate originally set during the review. So what rate—how should the rate for your client be calculated? The rate for our client needs to be calculated under some basis that is—reflects commercial reality. There were—it's difficult for me to go into this in open court, Your Honor, because much of this is confidential data of third parties. But there were two non-cooperative respondents that submitted quantity and value information. One of those two respondents did not itself submit the information, but its information was submitted by its importer in a fashion which did not comport with the Department of Commerce regulations. And, in fact, that information was ultimately placed on the record by Commerce in an extraordinary fashion. The second quantity and value information was placed on the record properly. That company ultimately determined not to cooperate, but the Department selected only one of the two non-cooperative— Is there some reason we can't use the names of these parties? The name of the company for whom the data was used is confidential, because they never put their—the name of that producer was never put off record. That's the one where the information was actually given by the importer. That's—the information was given by the importer. The information was—the data they used was provided by the importer who refused to disclose publicly his manufacturer. Commerce said, you must disclose the manufacturer for us to make a respondent selection. The foreign manufacturer, through their importer, said, no, we refuse to disclose our identity. So what happened to that data? So that data was—that data was ultimately not used in the respondent selection because it was determined that it— Was it used at all? What's wrong with that? What's wrong with it, Your Honor, is that there were multiple data points submitted. This particular data is disproportionate. It bears no relationship of any kind to the price data of any other—any other data of record. It doesn't bear— But the other—the data for the other parties, these were parties that were not the subject of the investigation, if I understand correctly, including your own client. Well, no, Your Honor, the other non—there is another similarly situated non-cooperative respondent who submitted Q&V, and Commerce did not use their data. But they were not a mandatory respondent, right? They were originally designated as a mandatory respondent, and that's when they chose not to cooperate. But eventually they—yeah. Right. But their data— So you want their data to be used? I have no problem with their data being used. Their data produces the difficulty— Well, why is Commerce bound to use their data instead of the data they did use? Well, the— What's the law? I mean, that's what you say. It was a big mistake. I understand it costs you some money, but that's what happens. Well, it's that it doesn't bear any—there's no grounding in commercial reality. The data that was selected itself— How do you know? It's data that came from a producer. No, Your Honor. Through an importer. Correct. It's data that came from an importer that, for a series of reasons, it's the only data in round numbers. It's data which is— What motive does the importer have to supply data that would be adverse to his supplier? Well, Your Honor, it wouldn't necessarily be adverse to his supplier. That's what I mean. It would ensure that his supplier would be selected as a mandatory respondent if that supplier— But unless there was a motive for the importer to supply information that is not market-driven or not accurate, then why can't we assume that that data was as commercially real as the data that was used? If it were a matter—let's assume it was a matter of these two sources of information, the one of which that came through the importer, the one of which that didn't. Assume that both had come directly from the foreign manufacturer. Could Commerce then have chosen which one of the two it wanted to use? I would believe, Your Honor, that based on the fact that the AFA must, as this Court said, and Gatlin reasonably reflect, have some grounding in commercial reality, that in such case— That's a question of fact, though, and if you have an importer that's supplying its data, I mean, who's in a better position to know what constitutes U.S. price of an importer? I would direct the Court's attention to the KYD determination in which this Court held that importer's information isn't directly relevant in AFA determinations. But it was submitted data on behalf of an exporter. It was uncertified. It was— Let's go back a little bit. Yes, sir. Your main problem is that Commerce recalculated U.S. price altogether. Yes, Your Honor. You would have rather that they not touch it. Well, I believe that they had no legal authority to do so, and if you allow Commerce to recalculate U.S. price, you're opening a floodgate. Now, let's go back and look at—go back and look at the remand order. Yes, Your Honor. And it says—this is JA01596, the remand order, and it says the U.S. Department of Commerce to reconsider the separate rate amount. That's your rate. Yes, Your Honor. We had a separate rate amount. Yes, Your Honor. To reconsider the separate rate amount after examining the following issues, and then enlist civil issues. But you didn't object to that remand at that point in time. That was okay with you? Yes, Your Honor. Those—all the issues that are enumerated relate to normal value, not to United States price. So why should we find that Commerce was wrong in recalculating your separate rate amount? Doesn't that involve rate—price comparison and the—to establish normal value and a U.S. price? It—Your Honor, it requires that all the elements be considered. If we allow a reexamination of normal price, we are also then potentially looking at—Commerce could say, we're going to reexamine now the scope of the order. There are—there must be some— Well, no, the remand order doesn't say that. The remand order is very specific. Yes, Your Honor. And that's to recalculate your rate. Oh, taking into account the following factors, all of which relate to normal value. Correct. And to recalculate your rate, and one of them is to find out whether AFA was corroborated or not, and they found that it wasn't. Yes, Your Honor. The problem I'm having, Counsel, with your position is that you did not object at the trial court level to the remand order. And it seems to me pretty clear that the trial court directed Commerce to recalculate your rate. Your Honor, I'm not sure exactly how I would have had an opportunity to object to the remand order. I thought you agreed—I thought the remand order was negotiated between you and the government. No, Your Honor. It was—we did move to have their brief treated as a motion for a remand. Did you ask the court not to include recalculation of U.S. price? You ran the risk that they were going to recalculate U.S. price. Your Honor, I didn't request that U.S. price be recalculated because at the time there was, in my mind, no dispute as to U.S. price. All the parties had agreed to U.S. price. We had expressly stated in our administrative brief that we did not object to U.S. price, and we had not raised it in our— But if you had said to yourself, oh, my goodness, if it goes back on remand and Commerce decides to recalculate U.S. price, there's a trap for the unwary there because they're going to use some data that I'd rather they wouldn't use, or they may feel they could use it. So the trap for the unwary was predictable if Commerce was going to try to recalculate U.S. price, right? Yes, Your Honor. So knowing that much, you might have said to yourself, well, I'll lean up there and tell that trial judge, hey, we're all for a remand, but not if you're going to allow them to recalculate U.S. price because that's already been calculated. Yes, Your Honor. I think that's what Judge Rain is getting at. Yes, Your Honor, I understand that position. I would suggest, though, that if we are going to examine that as a possibility, that then other issues, where is the limitation? Where is the finality? There's a body of law in which on remand Commerce has either exceeded its authority on the remand or has not. There's a body of cases out there. And so I would think anybody would know that on remand you were at risk to a wild and crazy Commerce doing something you don't want it to do. Well, Your Honor, they are different statutes. The only problem, though, is that the Court of International Trade has construed its own remand order as permitting Commerce to do what it did. And don't we have to defer to some extent to the Court of International Trade's interpretation of its own order? Your Honor, I think the question, though, is whether the court can interpret its own remand order to exceed the scope of proceedings that are before it. Our complaint delineated specific… If the court would have felt that, then it would have just remanded again and said, you, Department of Commerce, you've exceeded my remand order. Or you haven't met it. And I remand with instructions. But that didn't happen here. The court said, you did what I asked you to do. Yes, Your Honor. And that's why we came to this honorable body, because we believe that the court's decision was erroneous. I have one minute left. I would like to reserve that. We'll give you two minutes for rebuttal. Thank you very much, Your Honor. May it please the Court. Antonia Soros for the United States. I would like to begin with Jiang Zhu's contention that the Court of International Trade exceeded or Commerce exceeded the scope of the remand order by reaching the issue of U.S. price. Your Honor, as Judge Rayner and Judge Clevenger have recognized, the language of the remand order is broad. And I'd like to point out for the Court that a complete copy of the remand order is located in the appendix at JA 31A through 32A of the supplemental appendix, where you see that in entering the remand order, the language indicated, quote, that Commerce was permitted, quote, to reconsider the separate rate amount, end quote, after considering the issue of whether or not Commerce had corroborated the adverse fax available rate. Why on remand did the Department of Commerce choose to use BWA's data in order to establish normal value or to recalculate the selected rate? Am I correct that BWA was the worst offender, one of the worst offenders that appeared in this investigation? Your Honor, not the worst offender. Commerce has the discretion to look into the administrative record. We should back up and discuss the statutory anchor for what Commerce did. It looked to determining the AFA, and we should step back. Again, Jiang Zhu continues to contend that Commerce did not have the authority to consider U.S. price. We have to remember why Commerce went to the issue of U.S. price, looked at that variable. I think that Judge Reina's question is asking to go past that and to address the question of why you used this particular party's data rather than other data. Yes, Your Honor. One of the things that you said in that connection was that you chose this. As I understand it, Commerce chose this because it yielded a positive dumping margin, as though somehow that was a ground for using this data rather than other data. Yes, Your Honor. Isn't that itself open to question? No, Your Honor. It's not open to question. Of course, Commerce discusses that in the remand results. It explains its rationale for avoiding a U.S. price that would yield a zero margin. Well, what case authority says that Commerce can choose data to yield a particular result as opposed to yielding the correct result? Well, Your Honor, the adverse facts available provision of the statute, that's 1677E sub b, contemplates when Commerce is calculating or when Commerce is dealing with an uncooperative respondent, it may reach adverse facts. In this case, though, Jinsu was cooperative. They supplied data. They supplied questionnaire responses. They participated in briefing. Yes, Your Honor. Why were they punished when they, in fact, did cooperate during the investigation? Your Honor, that goes to the methodology that Commerce relied upon with respect to calculating. And I understand that. Yes. Non-market countries. Yes, and that methodology… I understand that, but it seems to me that Commerce had a choice between AFA data to use. Yes, Your Honor. And they chose the most adverse, the most onerous data or margin that they could find that existed on the record and to apply it to this company, and yet they participated, they responded, they showed up, they provided briefs. Yes, Your Honor, but the methodology used to calculate the separate rate required Commerce to look to the mandatory, the margins applied to mandatory respondents. So that limited… Is Mr. Craven correct that this AFA rate is only being used to calculate the separate rate for the appellant and for no other purpose? Yes, Your Honor. And we are constrained… That bears on Judge Reyna's question. I mean, it's not even being used against an uncooperative respondent. It's only being used against a cooperative respondent. Yes, Your Honor, but we are constrained by the statutory text that required Commerce to look to, to begin with, the mandatory respondents. And I'm speaking of 19 U.S.C., I'm sorry, Your Honor, 1673 D sub C sub 5. That tells us how we are to approach calculating a separate rate. In the, under the general rule of 1673… How does that general language give you support for making this specific choice to which both the other judges have referred? Yes, Your Honor. And if I may, I'd like to begin with the language of the statute that tells us that mandatories must be treated differently than entities, separate rate applicants such as Jiang Zhu. And that language… I'm not following that because the language that I see in the statute gives that as an example of how you do it, but it doesn't say that it has to be done that way. No, Your Honor, but in the exception, we, I'm sorry, I'll start with the language that Your Honor is looking at. I believe you're looking at… Because it's 5B, right? Yes, Your Honor. Because the rates in the record were de minimis and zero or AFA for the mandatories, we had to go to the exception. And under the exception, Congress, when faced with mandatory respondents that have zero de minimis and AFA margins, Commerce can use any reasonable method based on the language of the exception. And that's the point, any reasonable. So you had a choice at that point to select amongst the different companies that received rates. Well, Your Honor, we're talking about the methodology here. The methodology still, the methodology in the next sentence indicates that it's appropriate for Commerce or Commerce may conduct a simple average of the, and you'll see at the end of the statute it provides for the individually investigated. So we are constrained by the statutory language and Commerce's practice to look to the individually investigated. We cannot rely on Jiangsu's data. But why is it appropriate under the statute to use a punitive rate for a cooperative respondent? Your Honor, under KYD… What does that accomplish? Your Honor, under KYD, this court recognized that if an AFA rate is calculated pursuant to the statutory text, it cannot be punitive. And again, Commerce was looking to the separate rate provision under 1673D, sub C, sub 5, sub B, to calculate the, to determine the separate rate. KYD didn't involve this issue, right? I'm sorry? KYD didn't involve the issue. No, but it was speaking to the issue of when an AFA rate is punitive. So, of course, the court, this court recognized when you are working, when Commerce works from the statutory text provided by Congress, it cannot arrive at a punitive rate because it's lawful. No, but the question is why, the statute has a reasonableness requirement. Why is it reasonable to use, to select a punitive rate in preference to other rates which would yield a zero dumping margin where you're dealing with a cooperative respondent as opposed to an uncooperative respondent? Yes, Your Honor. But again, and I should point out, Your Honor, that we are talking about now methodology. How the separate rate was arrived at. And that issue, of course, was never raised before the trade court. Indeed, in the complaint, Jiangsu's complaint in the trade court, it embraced the methodology of doing a simple average of the AFA and the— I don't think it's the methodology that's at question. It's the values that are inserted and used in the methodology. Yes. So we're talking about this particular company, BWA, that on the record appears to have been the most unreliable of all companies that were investigated. Your Honor, in terms of reliability, I mean, there's nothing more reliable about Jiangsu's data than BWA. Equally reliable? I'm sorry? Both equally reliable. Equally reliable. Remember, Your Honor, we're dealing— If they're equally reliable, let me ask this question. Having used the data that was used to produce the U.S. price they did, explain to me why that was reasonable. Your Honor, BWA's AUV that was relied upon for U.S. price was reasonable because BWA reflected a commercially realistic data point, as indicated in the joint appendix at page 100. BWA accounted for a significant portion of the volume. Is it because of the significant portion of the imports? Yes, that suggests that it was a commercially realistic data point for Commerce to rely upon. Yeah, but the problem is that the reason you gave was that it was necessary to select a punitive rate to achieve the statutory purpose of punishing people who are not cooperative. But in this instance, that's not the effect of this. It's not to punish an uncooperative respondent. It's to punish a cooperative respondent. That's the problem. Why is that reasonable? How can it be that selecting a punitive rate in order to be punitive is appropriate with respect to a cooperative respondent? Your Honor, again, Commerce is not constrained in selecting—when it selected the U.S. price. Under the statutory scheme, and I'm referring to 1677E sub B, Commerce can choose any data point. If Your Honor, I'd like to draw your attention to that statutory scheme because it is incredibly relevant to this case. There, Congress has said Commerce, in determining adverse inferences, can look at four different sources for purposes of reaching adverse inferences. And the last source indicated is information on the administrative record. And in no way does Congress constrain Commerce in making a decision as to what value to choose. Here, Commerce saw, based on the data provided, that—and, of course, we have to point out that even Jiangsu recognizes— But that sounds like an argument that Commerce doesn't have to be reasonable. Yes, but Commerce was reasonable because the 40%— But why is it—but that comes back to the question— Why is it reasonable? Why is it reasonable to punish someone who's cooperative? Again, Your Honor, in KYD, this Court recognizes, as long as we're relying upon the statutory scheme— Oh, no, but that's—KYD's not dealing with punishing a cooperative respondent. You're not answering the question. Yes, Your Honor, I'm trying to answer the question. I'm sorry. Commerce determined that it was reasonable to rely on BWA's data because it was a commercially realistic— its volume into the United States from China for the period of review. We're talking about the actual period of review was commercially realistic. Let's take a look at that. BWA, their submissions were late.  They failed to cooperate with Commerce. And then at one point, they just stopped cooperating at all. Yes, Your Honor. Why is their data more reliable than a company who shows up, files briefs, files timely questionnaire responses? Why would Commerce—what's reasonable? What's reasonableness in choosing BWA's data over a company, even this particular company here? Yes, Your Honor, and Commerce explained its rationale for not choosing all the alternatives that Jiangzi set in front of Commerce. And that reason was a 0 percent margin does not reflect the policy impetus for the whole adverse facts available scheme. We may have a difference as to the legislative purpose for an AFA. I view it more to compel respondents to step forward and submit information. Of course, Your Honor. Yes. Do you agree with that? I agree, Your Honor. Well, here you have a respondent that has stepped forward and supplied information and been truthful and given the declarations and everything you require. Why would you use the worst possible data to reach the most onerous AFA rate on a company like the appellant? Yes, I understand, Your Honor, but we have to remember the methodology calls for two variables. One is an AFA margin and one—I mean, the two variables. One is—I mean, I'm sorry. The methodology calls for us to rely upon the data from mandatory respondents. Here, before the remand, of course, we could rely on Wujin Waters. In the plenary, for example, we could rely on Wujin Waters' data because it was not zero. Okay, but there were no mandatory respondents at remand by that time. No, there are two mandatory respondents, of course. And under the statutory scheme for the method for determining the separate rate requires that we do a simple average of the two mandatories. One of them was an AFA. It's inescapable, and Jiang Xu concedes in its complaint and on remand we have to do a simple average of the AFA as well as the rate— Well, that's not the issue. The issue is how you compute the AFA where you're dealing with a cooperative respondent. You say we have to choose the rate for BWA because it's necessary to be punitive here to deter people. And the question that we keep asking you, and I still don't hear an answer to it, is to why that purpose has anything to do with the appellant here who was cooperative. Because the variable that has to be considered is an AFA. It's inescapable from the methodology, which, of course, Jiang Xu concedes is correct. The methodology calls for looking at an AFA. If we were to look to Jiang Xu, we would not be following the methodology. We would be violating the whole analysis required for the separate rate, which is to look at an AFA. Your Honor, we have no other route to get to the separate rate, and it's spelled out— When you were looking at the AFA, did you have more than one set of numbers you could plug in? Yes, there were—I mean, and we have to also remember the substantial evidence. There are other options, Your Honor, but the substantial evidence standard of review— Why did you use the BWA numbers? Because it was commercially realistic. No other data that— Because it was necessary to be punitive is what you said, what Commerce said. No, I didn't say that, Your Honor. With all due respect— Commerce said that. Commerce said we're choosing the BWA rate because it's the only way we can be punitive. With all due respect, Your Honor, what Commerce did is that they explained we cannot accept—their rationale was clear from JA— What was the exact language? —which is located on pages 1588 through 1589 of the Joint Appendix, which is the remand results from Commerce. And it explains there the reason why— Why don't you get us right to the exact point, 1588, where— I'm sorry, Your Honor. 15—JA 1588. Jones. And I'll find— I'm looking down towards the end of that, 1589—JA 01 1589. It says, therefore, BWA's data was used for purposes of calculating a rate—a second AFA rate—applicable to parties that have failed to cooperate by not acting to the best of their ability to comply with a request for information. Yes, Your Honor. And that, again, we are constrained by Section 1673D, Sub C, Sub 5, Sub B, to rely on a methodology that reflects the two mandatories. Initially, our—I mean, I'm sorry I can't name the mandatories. I think it would make this process clearer. We have two mandatories. The mandatories initially received an AFA. One of the mandatories— Let me read you another part. On the next page, it says, on the second sentence of the second paragraph, it says, First, the Department's discretion in applying the AFA margin is particularly great when a respondent is uncooperative by failing to provide or withholding information. Then it goes on and cites some other things. It just seems to me that you're arguing something today that is not in the remand—Commerce's remand determination. Yes, Your Honor. The remand determination is clear that BWA's rate was used—their data was used to punish uncooperative and unreliable respondents. Your Honor, and I'd like to point out the language in the remand— Before you leave that page, could you look at 1589, please? And the last sentence of the carryover paragraph— I'm sorry, the last sentence of— The last sentence of the carryover paragraph on 1589 begins, An AFA rate of zero— Yes, Your Honor. Would not be sufficiently adverse as to effectuate the purpose of the facts-available rule to induce respondents to provide the Department with complete and accurate information at a time and a matter. Yes, Your Honor. That is the general proposition that underscores or underlies an AFA rate. But again, we are constrained by the methodology, which has not been challenged in the trade court. In the complaint, Jiangsu embraces the methodology of averaging— Does that policy, which Judge Plevenger read to you, have any application in this situation? Your Honor, yes, it does because the methodology— How so? Because the methodology for calculating the separate rate required Commerce to look at the mandatory respondents' rates. One of the mandatory respondents' rates was an AFA rate. The other one was a zero percent rate. But you're calculating a special AFA rate, which you're not applying to anybody else or using for anybody else except this appellant, right? Yes, Your Honor. This appellant was cooperative. So how is it—why is it necessary to use a punitive rate for someone who's cooperative? Your Honor, because the rate for the mandatory is—one of the mandatories is an AFA rate. I mean, we have that entity. The two respondents, again, the two mandatories, one received an AFA. We had two mandatories. One received an AFA. So we are basically constrained to calculate an AFA. But I thought you had a lot of discretion as to how to calculate— Of course, Your Honor. Of course, Your Honor. So why couldn't you exercise the discretion here to adopt a non-punitive rate because you're dealing with a cooperative respondent? Well, I mean, this—the methodology with respect—the AFA goes to the mandatory, one of the two mandatories. One of the two mandatories was not cooperative. That entity had to receive an AFA. Thus, under the methodology, which is unchallenged— They need to receive an AFA for purposes of calculating a dumping rate for them. No, Your Honor. The methodology for calculating the separate rate, the rate assigned to Jiang Zhu, the calculation is as follows. Separate rate equals a simple average of the AFA for mandatory one, the first mandatory respondent, plus a simple average— There were two mandatory respondents here. Yes. That's why we are talking about— One was BWA, who had a big number, and the other one had a zero rate. No, Your Honor. The two mandatory respondents—BWA was not a mandatory. The two entities were two other entities that were mandatories. One of them was cooperative and had a zero rate, and the other one was uncooperative. And that's why the AFA is in play. But the AFA rate you calculated here is not being applied to this other mandatory respondent that was non-cooperative, right? No, they did not challenge the first rate, the rate from the final determination. So the only purpose of calculating this particular AFA rate is to apply it as part of this overall calculation to a cooperative. Right, and we are constrained under the methodology, which is based on Congress's practice and, of course, 1673d— Why are you constrained? I mean, I thought you said you could—you had all sorts of discretion as to how to do this, and you could have used other data. I thought in response to Judge Clevenger's question, you said, yeah, we had the option of using other data, and we decided not to do it. Not for purposes of the—I'm sorry. Assume you have a methodology, and you follow the methodology, and the methodology produces the result that all three members of the panel have obviously shown concern with, which was taxing a cooperative party with a punitive rate, okay? Couldn't one fashion an argument or see that the faithful following of that mechanical procedure by Congress is arbitrary and capricious? No, Your Honor. And that produces the result that is violating of the statutory principle? No, Your Honor. Why not? Again, because 1673d— Don't agencies all the time, you know, faithfully follow what appears to be the chapter and verse, dotting the i's and crossing the t's of some elaborate procedure, and a court comes and the result is arbitrary? Your Honor, this is clearly a Chevron step one issue because the text that I've been quoting from expressly provides that we are constrained to look at only the rates applied to mandatories. And again, if I may read— But that's not the issue. The issue is how do you calculate that rate for this mandatory respondent where the only purpose of that calculation is to apply it to a cooperative respondent? You have discretion, which you yourself have said, to use this rate for BWA or a combination of other rates, and the only reason you have said, the Congress has said, we want to use the BWA rate rather than the other rate, even though we have discretion to use the other rates, is we're required to be punitive. No, Your Honor, I've never used that word. I'm sorry. With all due respect, it is not punitive. It was not a punitive rate. It was calculated based on the statutory scheme. And, Your Honor, if I may point out that 1673d sub c sub 5, at the exception, expressly states, commerce may use any reasonable method, and the end of the statutory text states, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated. The mandatories are the only individually investigated entities. Commerce simply cannot, under the plain, the express language of the statute, look to a Jiangsu. Jiangsu was not individually investigated. Only the entities we've discussed that received the AFA and that received the zero margin were individually investigated. We cannot, we cannot step out and look to Jiangsu. It would be undermining the statute. It would be violative of the statutory scheme to calculate a rate that way. I think we're out of time now. Thank you very much. I'm sorry, Your Honor. I appreciate it. Mr. Levin. May it please the Court. Good morning, Your Honors. My name is Jeff Levin. I'm with Mondial Trade Compliance, and I represent the defendant, the Pelley Compass Chemical International LLC, the petitioner in the underlying investigation. We respectfully submit that the issue presently before the Court is not whether, given this, given the set of facts before the administrative agency, this Court or the Court of International Trade would have chosen a different outcome. It is whether the decision of the Court of International Trade was unsupported by substantial evidence on the record or otherwise not in accordance with law. And we respectfully submit that the lower court's decision was not, and therefore this decision must be affirmed, much as the court below affirmed the determination upon remand of the Department of Commerce. Plaintiff's assertion that the issue of U.S. price was not within the voluntary remand, we respectfully submit, is without foundation. Compass Chemical respectfully submits that the first clause of the remand order naturally subsumes a direction to the Department of Commerce to reconsider the adverse facts available rate used as the basis for determining the estimated dumping margin for this separate rate applicant. After the department concluded that the original AFA rate used in that calculation was not corroborated, the department in essence had no choice but to select a new adverse facts available rate for purposes of calculating the separate rate. Having thrown open to appeal the AFA rate used in the calculation of the estimated dumping margin, the plaintiffs cannot now submit that only one side of the equation can be affected by the remand determination, that being the normal value and the U.S. price. Why isn't the petitioner entitled to challenge the methodology used on remand? I'm sorry, Your Honor, why is he not? Your adversary here is challenging the methodology used on the remand. So he's entitled to that, right? With all due respect, Your Honor, the methodology itself is not subject to appeal. It is not subject to appeal in the lower court. It's not an issue presently before this court. It's not before us. That is correct, Your Honor. In some cases, it is subject to appeal. Absolutely, and that was certainly the plaintiff's right to appeal the methodology. But for whatever reason, the plaintiff chose not to. And therefore, the Commerce Department… What do you mean they chose not to appeal the methodology? They certainly have argued that the AFA calculation that was used here is wrong and that it should have used other data. That's a challenge to the methodology. Well, it's a challenge to one of the two inputs used in the calculation. There's no challenge to the overall… There's no challenge, and that's what I meant, Your Honor. So are they entitled to challenge the input? Absolutely, and they have. What's your take on the question of whether or not the selection of BWA's AUV was reasonable? You've heard the argument, right? Absolutely, Your Honor. Certainly we agree with the government that BWA's data reflected commercial reality by virtue of the fact that… Was their data verified? Their data was not verified, but neither was the separate rate applicants. But you're saying that it reflected commercial reality because it fell into those corroboration zones that are expressed in the briefs. Well, it reflected commercial reality because of the percentage of imports represented by BWA, which was substantial, and if I understand you correctly, the largest… Let me read you something out of page 1590. This is page 17 of Commerce's remand determination. At the very top of the page it says, because BWA's data was used to calculate an AFA rate that may be applicable to parties, such as BWA itself, that have failed to cooperate, the Department finds that the use of BWA's data does not preclude it from calculating margins based on the actual data of entities appearing before the Department. Further, the use of the data belonging to cooperative entities, and it mentions your opponent, to calculate the rate, the second AFA rate, applicable to uncooperative parties, would preclude the Department from calculating an AFA rate that is sufficiently adverse to effectuate the purpose. That's the problem we're having there. You're familiar with that part of the remand? Yes, Your Honor, of course. So, you know that Commerce chose the BWA rate, the data, in part because it wanted to use adverse information to punish non-cooperative entities. I do not disagree with that aspect, Your Honor. The issue is whether the choice of using BWA's data in isolation was reasonable in and of itself. So, there's a lot of dispute here on the methodology, and we heard from the government, and reciting to the methodology the statute. The problem is the inputs. Yes. And Commerce has discretion, does it not? What inputs, what data is it going to use? Of course, Your Honor. Including and choosing the type of data it's going to use to reflect AFA, an AFA rate. Absolutely. That's within the Department's discretion. So, what they're doing here is they're saying, we want to make certain we get BWA, so we're going to use that rate, and we're going to achieve the statutory purpose of whacking uncooperative parties, which they talk about on page 1589 and 90 all the time, and in the process, we're going to whack a cooperative party. The price you pay for being in the party is to get the bad guy, the good guys get what the cooperative parties get, suffer the consequences, if you will, of the uncooperative parties. They're all in a pool. If I may respectfully submit, Your Honor, I believe the methodology was reasonable, even if you assume that the sole purpose of using BWA's rate was to yield a positive margin. The reason I say that is because if you used another party's data for the U.S. price side of the simple averaging methodology, you would yield a 0% margin. Now, I would argue— What's the matter with that? Because the plaintiff is a separate rate applicant, and the separate rate applicant's rate should necessarily be derived from the rates that were assigned to the mandatory respondents. Now, you did in this instance— Why is that so? Because there is no other basis upon which to calculate a separate rate applicant, and that's in normal course of department's procedures. In this case, BWA was not a mandatory respondent. That is correct, Your Honor. They were not, but the two— So, the economist had— It could drop down in the statute and make another selection. It was within the department's discretion to do so. They opted not to do so. That's the problem we're having. Right, and I understand that, Your Honor. I see the issue. I would frame the issue two ways. First of all, just on the basis of judicial review, was the department's remand determination reasonable? Was it based on substantial evidence on the record? Was it in accordance with the law? The lower court obviously agreed that it did. We submit and the government submits that it did, and we believe that's the standard that would apply before, Your Honor, this one. We review the CIT decision de novo. I understand that, but the standard of review is whether the CIT's decision is supported by substantial evidence or otherwise— Commerce, not CIT. Yes, yes, Your Honor. So, if you look at the judicial review, I believe that the methodology was reasonable. Was it the methodology? Was it the result that the lower court— Is there anything in the law, in your view, that would have prevented Commerce from using another respondent's data other than BWA or even Geng Su's own data? No, Your Honor. There was nothing in the law that I understand would preclude the use. However, because one of the two elements of the simple averaging methodology used to calculate the separate rate applicants was an adverse facts available rate, it is argued by the government, and we surely agree, that the purpose of the adverse facts available rate statute would not be effectuated if it yielded a 0% rate. Okay, good. And the purpose is to punish respondents, or is it to encourage respondents? The purpose is to encourage and punish. To punish those who fail to cooperate and to encourage present and future respondents to appear. That would be my reading. Yes, sir. And you participated throughout the investigation. Yes, Your Honor. And was counsel at that table as well? Did Geng Su participate? Yes, Your Honor. And you received the questionnaire responses? Yes, Your Honor. And their briefs? Yes, Your Honor. Okay. But if I... I think we're out of time unless there are other questions. Thank you very much. Thank you, Your Honor. Mr. Craven, you have two minutes. Thank you, Your Honor. If you feel the need to use them. I have just one or two quick points. The... Two minutes. The counsel for the government indicated that they had to use the rates of the two mandatory respondents. That would have been KWI and Woojin Water. Not BWA. BWA was not a mandatory respondent. The two respondents was an entity known as Woojin Water that ultimately received a rate of zero because they had a negative dumping margin of 34.91%. The other respondent was KWI. If we had used the KWI data in lieu of the BWA data, we would have had a zero as well. The answer is the data was chosen because it was the only data point that could produce a margin and we... As they explained on page 1590, they said we want to make certain that the BWA doesn't walk away non-cooperative party. We don't want them to walk away unstung. The only way we can sting them is to sting you too. Well, but, Your Honor, once we had... they had not appealed the initial decision of the Commerce, they were stung. Secondly, our position is that the data... Your Honor, you're saying it's too late. I mean this rationale that's being advanced at 1589-1590 is fallacious. Because BWA is going to walk away with a zero rate? No, BWA, Your Honor, has the 78% original AFA rate. This AFA rate that's being calculated here will not be applied to BWA which already has an established rate which is far in excess of zero, right? Yes, Your Honor. And in terms of corroboration, just one last point on BWA's... So they're already being, quote, punished. Right. Their argument that the BWA data falls into a zone of commercial reality is entirely based on an argument that they had volume. If you look at the data, you will see that their prices were extraordinarily different than every other data point that was presented in this case. I think we're out of time. Yes, Your Honor. Thank you, Mr. President. Thank you, Your Honor.